## YOUNGSTOWN (city) v HORN

Ohio Appeals, 7th Dist, Mahoning Co

Decided Oct 14, 1932

Verne Thomas, Youngstown, for plaintiff in error.

Wilson, Hahn & Wilson, Youngstown, for defendant in error.

FARR, J.

Coming to the proposition as to whether or not the verdict and judgment are against the weight of the evidence, the record discloses that the lot No. 1307 is in the angle of Monroe Street, which runs approximately in a northerly and southerly direction in the city of Youngstown. These two houses are situated on the easterly side of Monroe Street and face to the westward. Some years since there was a natural water course running between the two houses and that natural water course had laid in it a drain of some character which was later covered over with dirt. This sewer or drain had an outlet immediately across the street into a small body of water known by the name of "Grasshopper Pond." That continued for a time until it is said that the Republic Iron & Steel Company, desiring to make some use of the property, filled in the bond, made a manhole for the drain to enter, and in that way changing somewhat the flow of the water, so it is claimed.

On the other hand, it is said in behalf of the defendant in error that the city made some change in a sewer to the westward and that that change was so faultily made and maintained that it caused the water to back up into the drains leading to these two cellars of the houses in question, and it is urged in behalf of the defendant in error that when the water backed into the cellars that the properties could no longer be rented and that they became the object of predatory incursions by vandals in that part of the city, who were said to have car-

ried away the doors, siding, floors, windows; in fact, it is said that one house was entirely carried away. Many things are the object of larceny but it is a trifle difficult to understand how a whole dwelling house might be the object of such wrongdoing. There is a sharp dispute in the testimony concerning the drainage to this property. Representatives of the city, an investigator, perhaps, and one or two of the engineers, went to these properties to make an examination. It is claimed that the drainage from the cellars of the two properties connected with this drain which had been laid in the natural water course between the houses, and that when the water backed up into that drain, by reason of what is claimed to have been faulty construction of the sewer to the westward, that the water destroyed the foundations, the walls and that the premises generally were damaged. The investigator for the city says that upon going to these properties he was unable to find any drainage from these cellars. There is testimony by one or two of the engineers to the same effect. Upon the other hand there is testimony upon the part of the claimant below that there were such drains. Two gentlemen made an investigation. One man says that along the wall of one of the properties he found a trace of a drain. Another says that by digging down the distance of a foot or a foot and a half he found a drain about the middle of the cellar, and then a lady by the name of Pauline Wilhelm says that she had been to these properties and made some observations. She says at page 117 of the record:

"Q. What did you see?
A. I saw the water in the cellar. I was called down to see it. When I went down the water was about two or three feet deep in the cellars.
Q. Was that the condition in both houses?
A. In both houses."

And again:
"Q. And I will ask you whether there had been a flooding in those basements prior to that time?"

(Meaning the year 1928, and that was the date when it is claimed the change was made by the city in the sewer to the west of the property).

"A. No.
COURT: That you saw yourself?
A. No.

Q. What did you do after you found this condition?

A. I called up the city engineer's office, Mr. Turner at that time, and complained to him, told him about it and asked him if he would go down. I told him where the sewer was and he went on to explain to me the sewer went on beyond Washington Street and traced it out and told me he would go down and see about it."

Thus Mrs. Wilhelm says that she saw the water to the depth of two or three feet in at least one of these cellars, and it is claimed that it so remained until by percolation through the soil the water had drained out of the cellars.

Again at page 118, the same witness is on the stand and says:

"Q. I will ask you how long that condition continued to remain?

A. Well, until a little over two years ago."

It is claimed that this condition of drainage continued from the year 1925, when it is said that the change was made in the sewer to the westward and by the city, up until 1929, or a period of about five years.

"Q. If it was in the summer then you would refer to the summer of 1929?"

It is claimed that the drainage condition was relieved at that time by an improvement made by the city.

"A. Yes, sir.

Q. And during that period of time from the time you first discovered that water in the basement down until the two years ago, when you say you went down, did that condition continue to exist?

A. Yes, sir.

Q. What is the fact, Mrs. Wilhelm, with reference to water being in that basement over that period from 1925 to 1929, about that time?

A. Well, of course the house was vacant. It couldn't have tenants in the house. It was vacant and just went to rack and ruin.

Q. What about the water in the basement?

A. The water was there all the time."

Mrs. Wilhelm is corroborated in this behalf by Julia Horan, the guardian of Winifred Horan, who was adjudged an incompetent probably back in the early twenties and sent to a State Institution.

Now, upon the one hand we have the claim of Julia Horan to this effect, that these drains leading into the cellars of the two houses were so clogged by the making of the improvement or the change made by the city in the sewer to the westward, that the water and sewage backed up into these cellars. This is corroborated as above stated by Mrs. Wilhelm who testifies that she personally saw the water, that it led to a condition by reason of which the premises could not be rented; and it shoud be observed in passing that it is no fault of the city if vandals removed any part or all of these houses. There is some other testimony that reflects somewhat upon the proposition of these drains having been destroyed by the change in the sewer. On the part of the city there is a claim that there was no drainage from these cellars, and they offer credible testimony to that effect:—The engineer or engineers, the investigator for the city. It is quite necessary to have such persons who may investigate the facts under the circumstances of this case, but the difficulty is this, there is testimony pro and con, for and against, and when the cause comes into this court for review upon the question of the clogging of the sewer, the making of the drains, the result of the clogging, this court can not in the light of the well established principle say that the verdict of the jury is so manifestly against the weight of the evidence in those respects as to require a reversal. The jury heard and saw the witnesses. There might have been some error in judgment upon the part of the jury, but a reviewing court would scarcely be able to determine conclusively or discover such error of judgment, not having seen or heard the witnesses; so that, there is the testimony in favor of the claimant and against the claimant, and the jury evidently saw fit to believe the story of the claimant under the instructions given by the trial court.

There is complaint made as to a request to charge, which reads as follows,—Defendant in error's request No. 5:

"The court says to you as a matter of law that if you find from a preponderance of the evidence that plaintiff is entitled to recover, she is entitled to recover as to the northerly house, the difference between its value when the water first came up in the basement thereto, and its value, if any, when said water receded. As to the southerly house, she is entitled to recover the difference between the value when the water first came up into its basement and

its value when the water receded and as to the southerly house she is entitled to recover all loss of rents, if any, she sustained as a direct and proximate result of said condition during the period of its continuation."

If a contract of rental had been made for a definite period and the period of occupancy had been terminated by reason of the condition of these cellars, and the sewage and water backing into the same, that would be a matter that could be properly considered by the jury, but if merely prospective renting of the properties, surely not, because that would be submitting to the jury the question of prospective damages. However, there was no error in the submission of that question prejudicial to the plaintiff in error in this instruction.

This has been a somewhat difficult case. Speaking for myself, I feel that it is probably more than the jury should have awarded, even if the claims of the claimant be true, and yet upon the examination of this record there is testimony to sustain the contention of the claimant below, and under the well established rules that can not well be made flexible to suit a particular case, the conclusion must be that a reviewing court would not be justified in interfering with the amount of the verdict. The city did not offer particular testimony on the question of value, while the other side did, and it becomes apparent that it would be a difficult matter for the court to undertake to reduce the award of the jury in this case and the judgment; therefore the judgment must be affirmed.

ROBERTS and POLLOCK, JJ, concur.