WIDMER ET AL., APPELLANTS, *v.* FRETTI ET AL., APPELLEES.

(No. 4586—Decided January 28, 1952.)

*Messrs. Ohlinger, Koles, Wolf & Flues,* for appellants.

*Mr. Dan H. McCullough, Mr. Harry R. Illman, Messrs. Farber, Cochrane, Green & Schrader* and *Messrs. Hayward & O'Connor,* for appellees.

Fess, J. This is an appeal on questions of law and fact from a judgment entered on behalf of the defendants. Pursuant to a stipulation of the parties, the cause comes on for hearing and determination by this court on the pleadings, the transcript of the record and testimony and exhibits offered on the trial of the cause in the Common Pleas Court, subject to the objections thereto appearing in such transcript.

Plaintiffs, George L. and Marie Widmer, husband and wife, bring their action against Joe Fretti and 15 other defendants to enjoin the maintenance and operation of a gambling resort known as the Benore Road

Club and located on Benore road in Washington township, Lucas county, Ohio; and, as an incident to equitable relief, seek $40,000 damages for deprivation of property rights and of the quiet, peaceful and comfortable enjoyment of their home on Benore road, and for attorney fees. Upon the filing of the petition, the Common Pleas Court granted a temporary injunction. Upon final hearing, the petition was dismissed, the injunction bond released, and the temporary injunction vacated and dissolved.

Plaintiffs own a 144-acre farm fronting on the north side of Benore road, situated partly in Ohio and partly in Michigan. The property is intersected by the tracks of the New York Central Railroad, which extend for a half mile or so through the farm, the major portion of the farm being west of the railroad. It has a total frontage on Benore road of 1,200 feet. The Widmer home sets back from Benore road a distance of 469 feet, and is 491 feet west of the railroad. The house, comprising 10 rooms, was built in 1820, and has since been completely modernized.

Although there are a number of modest small homes in the vicinity of the Widmer property, the surrounding area is nonresidential and is not conducive to residential development. Under the Washington township zoning ordinance, the property north of Benore road is zoned for agricultural uses and that to the south is zoned for industrial uses. A manufacturing establishment occupies the property formerly operated as the Club Devon. West of the Widmer home is a small township cemetery. Benore road dead-ends at the Dixie highway (a main thoroughfare), about one-quarter mile west of the Widmer property. On the south side of Benore road near the Dixie highway are four small homes which were built some years ago. At the end of Benore road on the west side of the Dixie highway is a tavern with a trash dump adjacent there-

to. Between the Benore Club and the Widmer home is a three-track main line of the New York Central Railroad, crossing Benore road at grade, and about one-half mile further to the east is the viaduct of the hump leading into the classification yard of the Michigan Central Railroad. Between the old Club Devon property and the New York Central Railroad crossing and opposite the Widmer farm are the remains of dog kennels of an abandoned dog-racing track, one or two trailers, several sheds and a small packing plant with adjacent stock pens. West of and adjacent to the New York Central Railroad tracks are two fairly large greenhouses. The one-half mile distance between the two railroad crossings is occupied by three residences to the south and, also, two to the north of Benore road. In 1925, Marquette Place, lying west of the Club Devon, was platted for residential purposes, but only one house has been built therein. Within a mile or so south from the Widmer property, along the Dixie highway, are several automobile "junkyards" used for the storage of wrecked or worn-out motor vehicles, and, also, three notorious gambling resorts.

A great volume of testimony was received pro and con as to the possibility of developing the Widmer property for residential purposes. But the character of the surroundings and the expense of development incident to the platting and installation of water, sewer and other utilities does not warrant the conclusion that plaintiff's property has any potential value for future platting and sale of lots. The evidence fails to show that the operation of the gambling house impairs the value of the Widmer property for industrial development or for agriculture.

Evidence with regard to a number of civil and criminal proceedings in which certain of the defendants were involved, and wherein no admissions or pleas of guilty appear, has been rejected. The record com-

prises over 600 pages. Page after page relates to extraneous issues, such as whether the proximity of a railroad to property has any effect upon its future development for residential purposes. The court was fully enlightened to the extent of boredom regarding various and sundry real estate promotions running the gamut of blighted areas to Ottawa Hills village. Nevertheless, we have endeavored to sift the grain from the chaff and apply the law to the pertinent facts as disclosed by admissible evidence. An attempt was made to introduce testimony with respect to admissions made by the defendant Joe Fretti before the so-called Kefauver committee. The objection to this evidence is sustained because of lack of identification of the voice of Fretti by the witness who attended the hearing but who was not present in the room where the hearing was conducted.

In 1941, certain of the defendants constructed a large gambling casino, known as the Club Devon, across Benore road from plaintiffs' home. Mrs. Widmer's efforts to close the place proved unavailing. In 1942, plaintiffs sold the gamblers 33 acres of their farm south of Benore road for $12,500, and the Club Devon continued to operate as a gambling place until padlocked by order of the Common Pleas Court in the spring of 1944. In the criminal proceedings brought against certain of the defendants herein, each was given a workhouse sentence, and imposition of part of the sentences was suspended and the defendants placed on probation during good behavior for a period of three years. Following the closing of the Club Devon, plaintiffs further improved their home and the grounds surrounding it. In November 1946, the defendant Joe Fretti told the plaintiffs that ''our parole will soon be over. We want to open up again. It will either be on State Line road or east of the track.'' In May 1947, two parcels of property com-

prising nine acres south of Benore road and immediately east of the underpass of the Michigan Central Railroad were conveyed to the defendant Hyman Chait, and in 1948 he acquired 15 additional acres. The Benore Club was erected upon this property, and the evidence is conclusive that extensive gambling was continuously conducted on the premises. The "club" was eight-tenths of a mile from the Widmer home. By reason of the underpass, the building can not be seen from the plaintiffs' home. The club was also surrounded by a high board fence which insured privacy.

The evidence tends to show that after the club opened, traffic on Benore road past plaintiffs' property increased materially, particularly over the weekend. "Fish wagons" and taxicabs contributed to increase the flow of traffic on the highway. One witness testified that when the club was not operating, traffic decreased by 50 per cent. On occasion, when traffic was blocked by the New York Central Railroad crossing, it would back up as far as the Widmer lane, with resulting honking of horns, which disturbed the plaintiffs. Plaintiffs were pestered by autoists stopping and inquiring as to the whereabouts of the Benore Club. Occasionally, persons parked in the grounds, drinking and "necking." The grounds were littered with racing forms, beer cans and whiskey bottles. Plaintiffs testified that on returning home they would find their driveway blocked by these intruders. The Widmers were also annoyed by telephone calls inquiring for Joe Fretti.

Evidence that a substantial gambling resort was conducted at the Benore Club from June 1946 to July 1949 is uncontroverted. Whatever may have been the rule at common law with respect to gaming as a nuisance, statutory enactments denouncing gaming and the keeping of gambling houses make the keeping of such establishments a public nuisance. By the recent en-

actment of Section 13054-1, General Code, it is declared an absolute public nuisance per se. The mere fact that the General Assembly had not theretofore *in haec verba* declared that the operation of a gambling house constituted a public nuisance did not prevent it from being such. Gambling was declared unlawful and its conduct in violation of public rights was made an unlawful public nuisance.

The operation of a gambling house also constitutes an absolute nuisance, and, as such, imposes upon the operator strict or absolute liability for resulting harm without regard to the care exercised to prevent harm. *Metzger* v. *Pennsylvania, Ohio & Detroit Rd. Co.,* 146 Ohio St., 406, 66 N. E. (2d), 203; *Interstate Sash & Door Co.* v. *City of Cleveland,* 148 Ohio St., 325, 74 N. E. (2d), 239. As a public nuisance, the operation of a gambling house may be abated in an action brought for such purpose by public authority. To establish public authority's right to enjoin a nuisance per se, it is necessary to prove only commission of the act which constitutes a nuisance as a matter of law, and it is not necessary to prove that the maintenance of the nuisance interferes with the comfortable enjoyment of life and property by the public, since such is conclusively presumed from the commission of the act itself. *Engle* v. *Scott, City Mgr.* (1941), 57 Ariz., 383, 114 P. (2d), 236.

Although as a general rule a criminal act will not be enjoined, nevertheless an injunction will issue to inhibit a criminal act where such act invades civil or property rights and where there is no other adequate remedy available. 43 Corpus Juris Secundum, 762. The mere fact that the commission of a crime must be enjoined as an incident to the protection of civil or property rights does not deprive the court of jurisdiction. The criminality of the act neither gives nor ousts the jurisdiction. *People* v. *Seccombe,* 103 Cal. App., 306,

284 P., 725; *Cranford* v. *Tyrell* (1891), 128 N. Y., 391, 28 N. E., 518; *State* v. *Ehrlich,* 65 W. Va., 700, 64 S. E., 935, 23 L. R. A. (N. S.), 691; *Renner Brewing Co.* v. *Rolland,* 96 Ohio St., 432, 118 N. E., 118; *City of Cleveland* v. *Division 268 of Amalgamated Assn. of Street Ry. & Motor Coach Employees,* 85 Ohio App., 153, 85 N. E. (2d), 811.

However, private persons may not resort to equity to prevent criminal acts unless they are threatened with irreparable injury to their property, separate and distinct from that suffered by the public generally, and the relief must be such as only equity can give (43 Corpus Juris Secundum, 760, 766; 66 Corpus Juris Secundum, 833; 30 Ohio Jurisprudence, 400, Section 130; 4 Sutherland on Damages [4 Ed.], Section 1058), because a citizen whose civil or property rights are not specially injured may not usurp the duty imposed by law upon the duly constituted law-enforcement officers. Cf. *Hill* v. *Pierson,* 45 Neb., 503, 63 N. W., 835; *People, ex rel. L'Abbe,* v. *District Court of Lake County,* 26 Colo., 386, 58 P., 604, 46 L. R. A., 850. Nor does apathy or dereliction of duty upon the part of public officials accord a citizen the right to enjoin the criminal conduct. Therefore, in order to prevail in the instant case, plaintiffs must establish that they have suffered irreparable injury to their civil or property rights distinct from that suffered by the public at large.

A plaintiff seeking to enjoin an unlawful nuisance must show that he has suffered or is threatened with irreparable injury distinct from that suffered by the public, but his right to relief is not necessarily to be determined under the same principles as are applied to the abatement of a nuisance *per accidens,* such as, for example, was present in *Goodall* v. *Crafton,* 33 Ohio St., 271, 31 Am. Rep., 535; *Eller* v. *Koehler,* 68 Ohio St., 51, 67 N. E., 89; *Powell* v. *Craig,* 113 Ohio St., 245, 148 N. E., 607; *Stothfaugh* v. *Cincinnati Aluminum*

*Castings Co.,* 13 Ohio App., 334; *Antonik* v. *Chamberlain,* 81 Ohio App., 465, 78 N. E. (2d), 752; *Haywood* v. *Federated Lutheran Benevolent Society,* 29 O. L. R., 423; *Hazen* v. *Perkins,* 92 Vt., 414, 105 A., 249, 23 A. L. R., 748; *World Realty Co.* v. *City of Omaha,* 113 Neb., 396, 203 N. W., 574, 40 A. L. R., 1313; *Klaber, Admr.,* v. *Lakeman,* 64 F. (2d), 86, 90 A. L. R., 783; *Board of Commrs. of Green County* v. *Usrey* (1943), 221 Ind., 197, 46 N. E. (2d), 823; *Bell* v. *Pollack Steel Co.,* 28 O. D., 50, 19 N. P. (N. S.), 531. In the case of a nuisance *per accidens,* a clear case of nuisance and irreparable injury must be established and conflicting equities must be weighed, but in the case of a nuisance per se, the liability is absolute and injury to the public is presumed. If the evidence tends to show irreparable injury to the plaintiff, separate and distinct from that suffered by the public, by reason of the unlawful conduct, the injunction should issue.

In the instant case, the evidence fails to disclose that the value of the property of the plaintiffs has been impaired by the operation of the nuisance. Plaintiffs testified that before the opening of the Benore Club the rental value of their house was $300 per month, which was reduced to nothing during the period when the club was operating. Where the owners do not occupy the premises alleged to have been damaged, their measure of damages is diminution of rents and cost of repairs to the property incident to the injury. Such nonoccupying owners would have no claim for injury to peace and enjoyment. However, in the instant case, plaintiffs occupied their property. It was not rental property and the testimony that it could have been rented for $300 per month is speculative and does not tend to prove injury to the property itself. Loss of rentals may not be considered as an element of damage where no rental contract is terminated. *City of*

*Youngstown* v. *Horn,* 14 Ohio Law Abs., 249; 25 Corpus Juris Secundum, 545, Section 55.

Does the evidence tend to show that the peace, comfort and enjoyment of plaintiffs were impaired to such an extent as to indicate irreparable injury different from that suffered by the public at large? The personal inconvenience, annoyance or discomfort to the occupant of real estate caused by the maintenance of a nuisance in the immediate vicinity is a separate and distinct element of damage from that of the depreciation of the real estate itself. *Phillips Petroleum Co.* v. *Ruble,* 191 Okla., 37, 126 P. (2d), 526, 142 A. L. R., 1303, and annotations; *Ohio Stock Food Co.* v. *Gintling,* 22 Ohio App., 82, 153 N. E., 341; *Frey* v. *Queen City Paper Co.,* 79 Ohio App., 64, 66 N. E. (2d), 252.

The casino was located eight-tenths of a mile from plaintiffs' home. By its very nature, its operation was secretive and the club could not be observed from plaintiffs' home. The evidence is conclusive that vehicular traffic substantially increased during the operation of the gambling club, which traffic increase, plaintiffs say was annoying. However, when a right of way has been dedicated or is taken for a highway, an abutting owner must accept whatever increased volume of traffic results thereon. Although the purpose of a public highway is for the passage of the public, it may be conceded that land forming such highway was not taken for the purpose of enabling the public to pass over it only in the then known vehicles or for using it in the then known methods for the conveyance of property. *Eels* v. *American Telephone & Telegraph Co.,* 143 N. Y., 133, 38 N. E., 202, 25 L. R. A., 640, cited in *Ohio Bell Telephone Co.* v. *Watson,* 112 Ohio St., 385, 393, 147 N. E., 907. Thousands of householders are seriously annoyed by the juggernauts of modern transportation, but have no right at law or in equity to

abate the traffic or obtain damage resulting from such increased use of the highway. The annoyance resulting from trespassers engaged in drinking and ''necking'' is one of the vicissitudes of country life, and the evidence with respect thereto is purely speculative so far as having any connection with the gambling operation. Furthermore, it was within the province and power of the plaintiffs to exclude those trespassers from their property and prevent such intrusion. *Koontz* v. *Keller, Admx.*, 52 Ohio App., 265, 3 N. E. (2d), 694. With regard to persons inquiring as to the location of the Benore Club and the telephone calls for Joe Fretti, damages asserted are also too remote and speculative. The injury is more fanciful than substantial and there is no standard by which it can be even approximately compensated. *Bartow* v. *Smith*, 149 Ohio St., 301, 78 N. E. (2d), 735. Cases supporting recovery for personal discomfort or annoyance involve either excessive noise, dust, smoke, soot, noxious gases, or disagreeable odors as a premise for awarding compensation. Cf. 142 A. L. R., 1307. Cases relating to amusement and baseball parks refer to the attraction of large and boisterous crowds as a basis for recovery, but the premise upon which an injunction issues or damages are awarded is the noise emanating from the occurrence rather than the congestion of the street or highway. Cf. 33 A. L. R., 719, 725; 4 Restatement of the Law of Torts, 263, Section 831, Illustration 2. It should be noted that the foregoing cases relate to nuisance *per accidens*.

Irreparable injury from a nuisance which a court of equity will enjoin includes that degree of wrongs of a repeated and continuing kind which produce hurt, inconvenience or damage that can be estimated only by conjecture, and not by any accurate standard of measurement. Irreparable injury does not necessarily mean that the injury is beyond the possibility of com-

pensation in damages, or that it must be very great; and the fact that no actual damage can be proved, so that in an action at law the jury could award nominal damages only, often furnishes the very reason why a court of equity should interfere in a case where the nuisance is a continuing one. 39 American Jurisprudence, 426, Section 156; 66 Corpus Juris Secundum, 767; *Field* v. *Barling* (1894), 149 Ill., 556, 37 N. E., 850. Cf. *Olp* v. *Hocking Valley Ry. Co.*, 31 O. D., 453, 22 N. P. (N. S.), 433. The Ohio authorities are in accord with the proposition that an injunction may issue in a case where the nature of the damages is not susceptible of proper assessment by the trier of the facts. *Stines* v. *Dorman*, 25 Ohio St., 580, 584; *Brown* v. *Huber*, 80 Ohio St., 183, 207, 88 N. E., 322, 28 L. R. A. (N. S.), 705; *Dales* v. *Albrecht,* 11 Ohio App., 368, 371; *Arthur* v. *Bender,* 90 Ohio App., 187. An adequate remedy is one which affords relief with reference to the controversy, and which is appropriate to the particular circumstances of the case. *City of Mt. Vernon* v. *Berman & Reed,* 100 Ohio St., 1, 15, 125 N. E., 116.

Although some significance may be attached to the fact that, notwithstanding plaintiffs complained about the operation of the Club Devon, no similar action was taken by them to enjoin its operation directly opposite plaintiffs' property for a period of several years, nevertheless plaintiffs have testified that they were constantly annoyed as a result of the proximity of the resort to their home. This evidence is uncontradicted except by the testimony of several residents of the neighborhood that they themselves were not disturbed.

In *Powell* v. *Craig, supra,* the Supreme Court denied relief to a property owner seeking to enjoin the construction of a filling station (a nuisance *per accidens*) on the principle that whatever injury may have been suffered by such owner did not differ in degree or kind from injury resulting to others residing within the im-

mediate vicinity. This principle is somewhat inaccurately stated, since the principle upon which relief is denied is that the plaintiff must show that whatever injury he suffered is different in degree and kind from that suffered by the public at large, as illustrated in *Barkau* v. *Knecht,* 9 Dec. Rep., 66, 10 W. L. B., 342. The mere fact that others in the community may be specially damaged and have not elected to seek to abate an unlawful nuisance does not defeat the right of one who is similarly specially injured to obtain relief. *Story* v. *Hammond,* 4 Ohio, 376.

Plaintiffs are not seeking relief from annoyances and discomfort affecting the quiet enjoyment of their home as a result of the encroachment of lawful business and industry. The fact that the character of the neighborhood has changed over the years does not provide a shield behind which defendants may conduct an unlawful enterprise to the injury of the plaintiffs. The evidence tends to show that plaintiffs are persons of normal sensibilities, and specific instances were disclosed showing that as a result of the nuisance complained of, the use and enjoyment of their property was substantially lessened and the comfort of their home was invaded. That the damages sustained thereby are not susceptible of being ascertained and computed in money, does not defeat plaintiffs' right to relief. The operation of the gambling resort was an absolute public nuisance per se. Liability for its conduct is absolute and damage to the public, including the plaintiffs as members thereof, is presumed.

Although the plaintiffs have been unable to show that they have sustained compensable damage as a result of the operation of the resort, it is concluded that, by reason of the proximity of their home to the resort, they have suffered injury different in degree and kind from that resulting to the public at large and that they are entitled to have the operation of the nui-

sance enjoined. The evidence discloses further a reasonable probability that, if not enjoined, the unlawful operation may be resumed and, therefore, the question of the right of plaintiffs to relief has not become moot by reason of the discontinuance of the operation.

At the conclusion of plaintiffs' case, it was conceded that the evidence failed to disclose that defendants Harry Devine, Joseph Marzie, Edward Warnke and Al Schaib were connected with the Benore Club and they were therefore dismissed as parties defendant. The court finds further that the evidence has failed to show that defendants Mike Rodney, Bill Paul, Tony Paul, Nick Paul, Pittsburgh Lefty, Joe Muscles, Ben Fretti, Ben Aranoff, Joe Reno and Chalky Red, acted in a proprietary capacity at the resort, and as to them the petition is dismissed. The court finds further that the defendant Joe Fretti was one of the proprietors of the resort and that the defendant Chait was the owner of the premises and that such defendants should be enjoined from using, keeping or operating any gambling resort or establishment upon the premises described in the petition, and that the costs of this action in this court and in the Common Pleas Court should be assessed against such defendants.

Upon the claim of the plaintiffs for damages incidental to the granting of equitable relief, the court finds for the defendants.

After the filing of the petition, on June 29, 1949, the Common Pleas Court issued a temporary restraining order as prayed for in the petition. On final hearing, June 11, 1951, the petition was dismissed, the injunction bond released, and the temporary injunction was vacated and dissolved. Notice of appeal on questions of law and fact and an appeal bond were filed on July 16, 1951. On December 8, 1951, plaintiffs filed in this court a motion for an order to show cause why the defendants should not be punished for contempt in dis-

obeying the order entered by the Common Pleas Court on June 29, 1949.

An appeal on questions of law and fact entitles a party to a hearing and determination of the facts *de novo* upon the same or amended pleadings (Section 12223-21, General Code), and the perfection of an appeal on questions of law and fact removes the case in its entirety from the Common Pleas Court to the Court of Appeals for a trial *de novo*. But where a judgment granting an injunction is appealed from, it may be suspended only by order of the Court of Appeals or two judges thereof. Section 12223-18, General Code. When the injunction has been allowed and, during the pendency of the action in the Common Pleas Court, has been vacated either by a judge thereof in vacation, or by the court previous to the trial of the action, and where, after such trial an appeal is taken from the judgment or final order of the Common Pleas Court to the Court of Appeals, an injunction may be granted before judgment or final order in the action by the Court of Appeals in which it is pending, or a judge thereof. An injunction may also be allowed by the Supreme Court or Court of Appeals as a temporary remedy during the pendency of a case on appeal in such courts. Section 11879, General Code. Although probably inherent in the jurisdiction of the Court of Appeals, ample statutory authority is conferred upon the court to grant or dissolve temporary injunctions. Neither the granting nor dissolving of a temporary injunction constitutes a final order which may be reviewed by an appellate court. The perfection of the appeal herein did not reinstate the temporary restraining order which was vacated incident to the final judgment of the Common Pleas Court. We do not determine, of course, whether the defendants are guilty of contempt of the Common Pleas Court for violation of the temporary order during the period it was in force.

Inasmuch as no temporary injunction was sought or issued by this court, the motion for an order to show cause is overruled. See *Currie* v. *Baltimore & Ohio Rd. Co.,* 54 Ohio App., 505, 8 N. E. (2d), 453.

Our finding and judgment is for plaintiffs and against defendants Joe Fretti and Hyman Chait on the issue of granting an injunction, and a permanent injunction is granted. Our judgment is for the defendants on the claim for incidental damages. Costs are assessed against defendants Joe Fretti and Hyman Chait, and the petition is dismissed as to the other defendants. The cause is remanded to the Common Pleas Court for execution for costs.

*Judgment accordingly.*

CONN and SAVORD, JJ., concur.