VIRGIL ROSIN v. INTERNATIONAL HARVESTER COMPANY.

115 N. W. (2d) 50.

May 4, 1962—No. 38,501.

*Goetzinger, Roberts & Teigum, Rosengren, Rufer, Blatti & Hefte,* and *Richard L. Pemberton,* for appellant.

*Atwood & Fletcher,* for respondent.

MURPHY, JUSTICE.

This case is before us on appeal from an order granting the motion of defendant, International Harvester Company, for judgment notwithstanding the verdict. The plaintiff's claim is based upon the alleged negligence of the defendant in the manufacture of a pickup truck, which negligence, it is asserted, was the proximate cause of personal injuries which plaintiff sustained.

Viewing the evidence in the light most favorable to the verdict, as we are required to do, the following facts may be found from the record: The plaintiff purchased a ¾-ton International Harvester pickup truck in September 1959. The accident with which we are concerned occurred on August 17, 1960. At that time the truck had been driven 13,834 miles. The plaintiff was driving north on Highway No. 59 in Grant County, Minnesota. It was raining lightly, but the visibility was good. He observed an automobile ahead of him slowing down to pull off the road. He decreased his speed by removing his foot from the accelerator. As he did so he observed a truck approaching from the opposite direction. After coasting about 200 feet he applied his brakes firmly. At this time the truck coming toward him was about 500 to 600 feet away. It appears that he lost control of the truck when he applied the brakes. It began to skid and veered to the right. Then the plaintiff released the brakes. The truck, still skidding, then veered to the left, then to the right, and lastly to the left. This placed the plaintiff on the left side of the road in the path of the approaching truck. A collision followed, resulting in the damages for which the plaintiff seeks compensation.

After the collision the truck was towed to a repair shop at Elbow Lake, a distance of about 3½ miles from the scene of the accident. There was no evidence that the truck was interfered with from this date until an inspection was made on August 25, 1960. The repair shop was operated by a mechanic specializing in brake and alignment work. On August 25, this mechanic, together with a consulting engineer, examined the truck. They found that the differential lubricant had saturated the right rear brake linings and covered a substantial portion of the wheel assembly, and they concluded that this circumstance accounted for the erratic braking action of the truck.

It appears from the record and oral argument of counsel that the rear wheels of the truck in question are lubricated independently and not by the differential oil flowing through the axle housing to the wheel. It is not clear from the record how the rear wheel assembly is maintained or lubricated, but we gather that at intervals the rear wheel assembly must be dismantled and the wheels repacked. The specific defect which caused the difficulty, according to the plaintiff's witnesses, is found in a defective grease seal which is part of the rear axle assembly. From the record it appears that at the center of the rear axle is the differential, which is connected to the driveshaft. Extending out on each side of the differential is the banjo or axle housing enclosing the rear axle. At the end of the axle housing is an inner seal, made of pressed steel housing, with a leather ring on the inside acting as a seal. Next to the seal is a bearing, then shim washers, a backing plate, a steel spacer, and an additional seal, referred to as an outer felt seal. At the end of the axle and next to the hub is a steel grease shield. There is a hole at the bottom of this shield from which excess lubricant may drain to the ground. Beyond the grease shield rests the wheel assembly. The differential lubricant extends out from the differential to the end of the axle housing where the inner seal is placed for the purpose of preventing the flow of lubricant into the bearing and wheel assembly.

Both of plaintiff's expert witnesses concluded that the differential lubricant had leaked through the inner seal on the right side of the banjo housing and passed into the wheel assembly, saturating the brake shoes. This saturation caused the malfunction of the brakes in the right rear wheel. They concluded that the saturation would prevent friction on the brake lining. The result would be that the brakes would be effective on the other three wheels but not on the right rear wheel, causing the truck to veer off its course in the way the plaintiff described. They concluded that the inner seal was not suitable for the intended purpose of keeping grease from flowing from the differential into the right rear wheel assembly. They were of the opinion that while the seal might serve its purpose under ordinary highway use it was not designed to withstand pressures to which it would be subjected on rough or uneven road surfaces and that if the truck were stalled or

tipped to one side the pressure resulting from the operation would cause the differential grease to seep through the inner seal.

The plaintiff secured from the parts division of the defendant company a replacement for the alleged defective seal. This replacement part became an important piece of evidence in the plaintiff's case. It was compared with the inner seal in the truck, which is referred to as a production part. From this comparison it was concluded by the plaintiff's expert that the production part was not the substantial component that it should have been for the intended purpose in that it lacked the proper design, strength, and flexibility. The production part was ¼ inch thick while the replacement part was ½ inch thick. The replacement part had a coil spring backing supporting the leather which the original seal lacked, and the leather in the replacement part was of a firmer quality. He, accordingly, concluded that the original seal was not effective for the purpose of preventing the differential grease or oil from coming into contact with the axle bearing in the wheel assembly.

In its brief the defendant argues at some length that the negligent operation of the pickup truck by the plaintiff was the proximate cause of the accident. We are satisfied, however, from an examination of the record that there is sufficient evidence from which the jury could find that the accident resulted from the erratic movement of the truck caused by a malfunction of the brakes. We think the trial court correctly perceived the determinative issue in the case when it instructed the jury:

"* * * The sole question is, did the International Harvester Company fail to exercise reasonable care in the design of and in the use of materials in the grease seal on this truck, having in mind the use for which it was manufactured and the persons who would use it."

■ The law to be applied in this case has been clearly stated in several recent decisions. Lovejoy v. Minneapolis-Moline Power Implement Co. 248 Minn. 319, 79 N. W. (2d) 688; Hofstedt v. International Harvester Co. 256 Minn. 453, 98 N. W. (2d) 808; Grant v. Malkerson Sales, Inc. 259 Minn. 419, 108 N. W. (2d) 347. In the Lovejoy case we said (248 Minn. 325, 79 N. W. [2d] 693):

"In this state it is well established that the manufacturer of a chattel may become liable to those who it should expect will use the chattel if it fails to exercise reasonable care in the design thereof, or in the use of material, which it should realize will involve an unreasonable risk of bodily harm to the one using such chattel for a purpose for which it was manufactured and sold even though there is no privity between the user and the manufacturer."

In considering the record as it bears upon the asserted failure of the defendant to exercise reasonable care in the design of the inner grease seal and the strength and quality of the material used in its construction, we have carefully examined the testimony given by the expert witnesses for the parties. The plaintiff's principal expert was a consulting engineer of considerable experience, an assistant professor of mechanical engineering at the University of Minnesota. His other expert was a garage mechanic with a background of education and mechanical training at the Dunwoody Institute and Morris Agricultural School who specializes in the area of alignment, repair, and maintenance of brakes. The defendant's principal expert was an independent engineer who acted as a consultant to architects, contractors, and suppliers of building material. His work also involved analyzing various types of steel for industrial application. The defendant's second expert was its district service manager, whose background was that of a mechanic. He did not pretend to special knowledge in the field of design, his competence being limited to the servicing of his company's products. While he had visited his employer's manufacturing plant and observed work on the assembly line, he had never been employed in that work. He had no knowledge or experience with reference to tests or inspections conducted in the area of quality standards which deal with the reliability of a motor vehicle. The defendant's experts expressed the view that the cause of any mechanical malfunction was not faulty design but improper use and maintenance of the vehicle by the plaintiff. They contended that the presence of the differential lubricant in the wheel assembly could be attributed to the operation of the truck by the plaintiff under abnormal conditions. There was evidence that in April 1960 the plaintiff drove the truck into a corn stubble field for a short distance

in making a turn onto the road and that the rear of the truck became mired in soft earth. It was pulled out by use of a tractor. There was also evidence that in the previous winter the truck was on one occasion stalled in the snow. Essentially the defendant contends that the malfunction of the right rear wheel assembly could only result from abnormal use of the truck by its operation under driving conditions not foreseeable by the manufacturer. When asked to explain what he meant by abnormal conditions, the defendant's expert engineer testified:

"Well, abnormal conditions would be putting—if this is a pick-up truck—putting six tons on it and traveling in the middle of the desert or something of that kind. In other words, this transmission, if it got excessively hot and traveled at a much higher temperature than normal, it could bleed these bearings and heat the grease out of them. Or other abnormal conditions, if it got stuck with one wheel way down, with the high level higher than this brake, and the thing was ground in that position, and it heated up, the same thing could happen. These conditions are not designed for this truck, unless it's a special type of design for special service."

It appears from the record, however, that in the interval between the occasions when the truck had been stalled and the date of the accident the truck had been properly serviced and received the usual maintenance, including lubrications.

The asserted negligence in the design and manufacture of the component in question must be viewed in the light of the risks which the manufacturer should reasonably have anticipated in the intended use of the product. It is well established that if a chattel is used for some purpose or in some manner which could not reasonably have been foreseen or anticipated by the manufacturer, it cannot be held liable for damages resulting from such use. To establish negligence there must be a risk reasonably foreseeable.[1]

---

[1]Lovejoy v. Minneapolis-Moline Power Implement Co. 248 Minn. 319, 79 N. W. (2d) 688; Palsgraf v. Long Island R. Co. 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253; Greenwald v. Northern States Power Co. 226 Minn. 216, 32 N. W. (2d) 320.

In the Lovejoy case a farm manager sustained injuries in the operation of a tractor pulling a load of hay. In driving the vehicle downhill he used the compression of the engine as a braking force, which caused a pulley to disintegrate, resulting in injuries. We there held that the questions as to what caused the pulley to break; whether the defendant should have anticipated that the tractor would be operated at a speed in excess of that recommended; and whether the manufacturer should have so anticipated and provided the purchaser with adequate warning of the dangers inherent in the use were on the record questions of fact for the jury. We think the factual situation in the case before us is substantially analogous. It was for the jury to determine under all of the evidence whether the defendant should have anticipated that the pickup truck, designed and adapted as it is to use in transportation work on farms and in business, would on occasion be driven on rough or uneven ground so that one side of the truck would be at a higher level than the other. Whether the manufacturer should have anticipated that such use would require the installation of a more substantial grease seal to prevent the differential lubricant from causing a malfunction of the brakes, and whether the manufacturer should have provided instructions or warning of dangers inherent in the operation of the particular truck, were questions of fact for the jury.

The defendant relies for affirmance on Hofstedt v. International Harvester Co. 256 Minn. 453, 98 N. W. (2d) 808, and Jeske v. George R. Wolff Holding Co. 250 Minn. 16, 83 N. W. (2d) 729. Both cases are readily distinguishable. In the Hofstedt case the plaintiff was injured when his hand was drawn between a belt and pulley of an independent power takeoff attached to a tractor. The plaintiff failed to establish a defect in the design or that unsuitable material was used by the manufacturer, nor was there evidence of any assembly defect when the tractor was sold to the purchaser. In the Jeske case the plaintiff was injured by falling on the steps of a building. Negligence was predicated on the asserted failure of the defendant to remove an accumulation of leaves from the steps and the absence of a handrail. There was a complete failure to establish any causal connection between these circumstances and the occurrence of the accident. The proof left the cause of the plaintiff's fall in the realm of speculation and conjec-

ture and was made even more doubtful by the (250 Minn. 21, 83 N. W. [2d] 732) "positive testimony of many reliable and disinterested witnesses" as to the intoxication of the plaintiff at the time the accident occurred.

In the case before us, however, the asserted negligence is based upon reasonable inferences arising from proven facts. The precise defect in the mechanical structure of the rear axle and rear wheel assembly was brought into focus by the testimony of plaintiff's witnesses based upon a physical examination of the parts claimed to be defective. On this testimony, if the jury chose to believe it, they could find that the defendant company should have anticipated that the grease seal of the type found in the plaintiff's truck would not effectively serve its intended purpose. There was evidence that the inner seal found in the vehicle was only half the size of the recess which was designed to hold it against its sealing surface and that it contained no support to hold it vertical and keep it firm. There was also evidence that the seal was made of flexible material which would not hold its firmness and failed in its appointed function of keeping the differential lubricant away from the brake lining. Moreover, there was evidence from which the jury could conclude that the manufacturer should have in the first place installed a grease seal of the design and quality of the replacement part.

■ Little need be said with reference to the defendant's claim based upon the asserted contributory negligence of the plaintiff in failing to keep the hole in the grease shield free from an accumulation of mud and dirt. While the trial court instructed the jury generally on the subject of contributory negligence, we cannot find from the record that this precise point was strenuously urged at the trial. At any rate it was for the jury to decide under the circumstances if the defense of contributory negligence had been established. There was no evidence that the plaintiff knew of the existence of the hole in the grease shield or of its purpose. There is no evidence in the record that the plaintiff ever received instructions with reference to the maintenance of the vehicle. When interrogated on this point the service manager for the defendant company said, "We do not attempt to guide people in the operation, where they're going to go with the trucks they purchase from us."

The jury could well have considered that this hole, being located at an obscure point near the bottom of the wheel hub, would inevitably become caked with dust or dirt and that an operator would not be aware of its presence or purpose without specific instructions. Moreover, we must keep in mind that the burden of proving contributory negligence rests on the defendant. It was for the jury to determine whether under all the circumstances that defense had been established.

■ We have held on numerous occasions that a motion for judgment notwithstanding the jury's verdict will be granted only when the evidence is conclusive against the verdict. The motion accepts the view of the evidence most favorable to the verdict and every reasonable inference therefrom, as well as the credibility of the testimony for the adverse party. If it has reasonable support in the evidence, it must be accepted as final both by the trial court and by this court on appeal.[2]

The order is reversed and verdict reinstated.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

[2]Fulsom v. Egner, 248 Minn. 156, 79 N. W. (2d) 25; Cofran v. Swanman, 225 Minn. 40, 29 N. W. (2d) 448; Rules of Civil Procedure, Rule 50.02.